## MAVERICK *vs.* REYNOLDS.

*In the matter of proving the last will and testament of* REBECCA MAVERICK, *deceased.*

THE testatrix, at the time of making her will, was ninety years of age; and the probate was contested on the ground of testamentary incompetency, and undue influence. It being shown the decedent was of sound mind; that the will was executed with publicity; that it was in harmony with an instrument made six years before, when her capacity was unquestioned; and likewise consistent with her intentions, often expressed before and after it was executed; that its provisions were reasonable; that when made it was carefully read and explained; and there being no trace of concealment, influence, or deception,—the will was admitted to probate.

Great age alone does not constitute testamentary disqualification; on the contrary, it calls for protection and aid to further its wishes, when a mind capable of acting rationally, and a memory sufficient in essentials, are shown to have existed; and the last will is in consonance with definite and long-settled intentions, is not unreasonable in its provisions, and has been executed with fairness.

D. T. WALDEN, Jun., *for Contestants.*

THERE are two questions in this case.

I. Whether the deceased, at the time of the execution of the will, had a disposing mind, and memory sufficient to know her property, her kindred, and their claims on her bounty? (*Swinburne, p.* 72, 77. 6 *Co.,* 23, *in Marquis of Winchester's Case. Rambler* vs. *Tryon,* 7 *Serg. & R.,* 95. 1 *Peter's R.,* 164.)

II. Was any undue influence brought to operate on decedent, to produce this will in favor of one set of her grandchildren to the exclusion of others?

1. As to capacity. There is a great mass of evidence, *pro* and *con.*

(*a*) The contestants produce Mrs. Townsend, Mrs. Osborn, Catherine Braman, Angelica Maverick, Dr. Pratt, Mrs. Johnson, Mr. and Mrs. Warner.

(1.) These prove, during a period between 1847 and 1850, loss of memory, childishness, and incapacity to attend to her business affairs, although at times she may have spoken and conversed rationally.

(2.) Three of these, Mrs. Osborn, Catherine Braman and Angelica Maverick, prove her statement to the effect that she would provide by her property for her other grand or great-grandchildren.

(*b*) The executor has examined Dr. Berrian, Dr. Maxwell, James Stokes, Mr. Wykoff, Mr. Dugan, Mr. Nexsen, Maria and Margaret Johnson, James T. Griswold, Ann Maria Griswold, and Mrs. Torboss.

(1.) These prove the character of the decedent's mind and memory up to 1848, when she left Liberty Street; but know nothing of it since, except Mrs. Torboss, who swears to two instances, one in 1848, and the other in 1850.

(2.) The witnesses who speak of her since 1847, or February, 1848, are Joel M. Johnson and Ellen Conklin, who met her at Godwinville, New Jersey, one for about ten days, and the other for about five or six days; Dr. and Mrs. Hilton, Mr. and Mrs. Burke, Mrs. Everett, Mrs. Wheeler, Thomas Townsend, Mrs. Nellis,—and Mr. Dewey, and Miss Phillips, the witnesses to the will.

While the opinion of witnesses on facts stated is competent evidence, still their force and value depend on the general intelligence of the witness,—the grounds upon which the opinion is based,—the opportunities for accurate or full observation,—and on his entire freedom from interest or bias, or prejudiced state of mind. (*Clark* vs. *Fisher*, 1 *Paige,* 171, 173, *Culver* vs. *Haslam,* 7 *Barb. S. C. R.,*

314, 325, *per Willard, J.    De Witt* vs. *Barley*, 6 *Law Reporter, U. S., p.* 33, *May No.*, 1853.)

We desire that the evidence of the witnesses shall be thus tested :

1st. Dr. and Mrs. Hilton, Mr. and Mrs. Burke, Mrs. Everett, Mrs. Wheeler, and Mrs. Phillips, are all near relatives and connections of Mr. Reynolds, the executor, and of the devisees under the will,—biased and prejudiced to shield the one and assist the others.

Mr. Dewey is a law associate ; Thomas Townsend, operated upon by some interest—the hope of favor from the executor's position in other matters.

2d. The opportunities for accurate and full observation.

Where were there better, than of those with whom the testatrix lived, and who were in daily intercourse and association with her ? How much greater the opportunity, than of those who saw her but occasionally—at long intervals— and then but for a short period of time !

Take, for instance, the testimony of Mrs. Torboss, Mr. Nexsen, Mr. Dugan—how is their evidence as to capacity after February, 1848, to be viewed in comparison with that of Dr. Pratt, Mrs. Townsend, and Miss Maverick ?

(c) While old age may not in itself incapacitate the testatrix, still, when taken in connection with severe sickness just previous, and the other facts in the case, it strengthens the testimony of the contestants. (*Turner* vs. *Turner*, 1 *Littell R.*, 102.)

(d) There are other facts which, as evidence produced by the executor, prove that there was want of capacity of deceased to attend to her own affairs, to contract for her own board, to pay her own bills, or even to receive her own money.

Where a person is under guardianship as *non compos*, the presumption is that he is incapable of making a will. (*Breed* vs. *Pratt*, 18 *Pick.*, 115.)

(1.) The power of attorney executed March, 1848, is in

effect letters of guardianship to Mr. Reynolds, of the estate of the deceased.

(2.) The receipts show that Mr. Reynolds paid her bills, managed her affairs, and held her estate in his hands.

(3.) The testimony of executor's witnesses shows that she would make no change in her boarding-place, or control her own person, without Mr. Reynolds' consent.

(*e*) The reason given by some of the executor's witnesses, as coming from deceased, why she intended to exclude the children of Samuel's first wife, is *inconsistent* with the idea that this same intention was held by deceased in 1842, before any provision was made by Mr. Aaron Howell.

That will was more reasonable than the one now offered for probate, because her son was then living; yet even that may show the hand of the executor, Philip Reynolds, and may have been produced by the same influence as this.

(*f*) The statements of executor's witnesses as to declarations of deceased in regard to the disposition of her property, are in many respects conflicting. In one or two instances, it is said that she intended to equalize the property among the children. Mr. and Mrs. Burke contradict each other; one says it was in the summer of 1849, the other sometime in November.

(*g*) The children of Samuel's first wife received about $1,000 each; this was all their *children* had,—many of the contestants are great grandchildren of deceased.

The children of Clara received their mother's property.

II. As to the influence in producing the will.

(*a*) The will was drawn by Mr. Reynolds.

(*b*) He was her legal adviser, and in effect the guardian of her person and estate; and she trusted and confided entirely in him.

The law looks with great jealousy upon devises obtained in this way, and will not sustain them without the clearest evidence of free will in the disposition that is made.

(*Crispell* vs. *Dubois*, 4 *Barb. S. C. R.*, 393, *Barry* vs. *Butlin*, 1 *Curteis Ecc. R.*, 637 ; 2 *Phill.*, 323.)

(c) The will was executed in the presence of the sister of the executor's wife, and his law-clerk. The presence of other persons in an adjoining room cannot add strength to the will, as at the time of execution decedent was excluded from them, and only in the presence of her guardian, his relative, and his associate.

(d) The person who drew the will had control of her property, is the executor under it, and the *devisees* are his *nephews.*

(e) There is no evidence of instructions to draw this will.

(f) The evidence that the deceased understood the will when read to her is doubtful ; at least her asking questions at the time is evidence that she did not understand it.

There is a conflict between the attesting witnesses, as to how often the will was read, and what the deceased said at the time. Miss Phillips says, that she asked Mr. Reynolds if it was right.

(g) This is sustained, by the evidence that she afterwards declared her ignorance as to what was in the paper she had signed.


III. If the contestants shall have failed to prove either sufficient want of capacity or sufficient undue influence, when standing alone, yet the combination, in a less degree, may be sufficient to invalidate the will, and induce this court to pronounce against it. (*Butler* vs. *Benson*, 1 *Barb. S. C. R.*, 538. *Sears* vs. *Shafer, Ib., p.* 412, 413, *per Barculo, J.*)

P. REYNOLDS, *Executor, in Person.*
WM. C. FREEMAN, *for Executor.*

I. The paper offered for probate was executed as required by the statute.

II. The decedent, at the time of executing the will, was of sound and disposing mind and memory, and in all respects legally capable of making a will.

The law presumes, that the testatrix at the time of executing the will was sane. Insanity must be proved. (*Peters, C. C. R.*, 162.)

Old age raises no presumption against the capacity of the testatrix. Incapacity must be proved. (*Swinburne, Part 2d*, § 5, *Van Alst* vs. *Hunter*, 5 *John. Ch. R.*, 148; *Bleecker* vs. *Lynch*, 1 *Bradford*, 458; *Lessee of Hoge* vs. *Fisher, Peters, C. C. R.*, 163.)

The testimony on the part of the executor, shows *capacity before*, and *at the time*, and *after making the will;* and the contestants have failed to destroy or weaken this testimony. The mere fact of being unlearned or illiterate does not incapacitate a person from making a will. (5 *John. C. R.*, 148; 26 *Wend.*, 255.)

Physical suffering of itself is no evidence of incapacity; unsoundness of mind and memory must be connected with it, to create a legal incapacity. (*Voets' Com. on Pandects, lib.* 28, *title* 1, § 36.)

Imbecility of mind, apart from idiocy or lunacy, is no evidence of incapacity. (3 *Denio*, 37: 21 *Wend.*, 142; 24 *Ib.*, 85.)

Defect of memory, *unless total*, or it appertains to things *essential*, will not establish incapacity. (*Bleecker* vs. *Lynch*, 1 *Brad.*, 458; *Martin Silbers' Will*, 2 *Ib.*, 133; *Stevens and Wife* vs. *Vancleve*, 4 *Wash. C. C. R.*, 262.)

III. The testimony does not show that undue influence or clandestinity was used to procure the making or execu-

tion of the will. Facts and circumstances must be proved, showing undue influence, to raise or warrant a presumption of unfairness in the transaction. (1 *Brad.*, 458 ; 3 *Denio*, 37 ; 22 *Wend.*, 526.)

IV. The provisions of the will are consistent with natural affection, and in conformity with the intentions of the decedent.

THE SURROGATE. Mrs. Maverick, at the time of making the will offered for proof, was 90 years of age; and the probate is contested on the ground of testamentary incompetency, and undue influence.

She had one son, Samuel Maverick, who died in 1845. Samuel's first wife was Mary Howell; and his second wife Clara Reynolds, a niece of the decedent. The will gives all the estate of Mrs. Maverick to the four children of Clara, to the exclusion of the children and grandchildren of Mary Howell. Samuel's children by his first wife received from their grandfather Howell, about $1,000 apiece. The four children by the second wife receive by this will of their grandmother Maverick, one-seventh of the House No. 85 Liberty Street, in the city of New York.

This old lady had resided with her son and her daughter-in-law, many years, at No. 85 Liberty Street.

On the decease of Clara, Feb. 22, 1848, the establishment was broken up, and she removed to Troy Street, where she boarded with Mrs. Townsend.

In June, 1842, she made a will, wherein, after giving a few trifling legacies, the largest of which was fifty dollars, to her granddaughters by Samuel's first wife, she devised the bulk of her estate to her son Samuel, and in the event of his death previous to her decease, to his wife Clara. As this will provided for the contingency of Samuel's death, it does not appear to have been disturbed when that event happened. Clara's decease, however, rendered it almost

entirely nugatory. Accordingly, another will was executed within four months,—giving the estate which would have passed to Clara, under the previous will, if she had lived, to her children.

The decay of the human faculties, frequently consequent upon old age, is usually gradual, and often so imperceptible that it becomes necessary to select certain intervals or distances of time as points of observation, in order to mark its progress with accuracy. Where there are no marked stages of mental failure, the beginning cannot be traced; though, as infirmities increase, the indications of a broken and enfeebled intellect become manifest and decided. It is especially in such cases of gradual decline, we should guard against a common tendency of the memory to carry its present or recent impressions, derived from continued habitual observation, to an undefined period of time; and thus to judge rather from present opinions than from recollected facts. The witness for the contestants, who enjoyed the best opportunities, during the last years of the life of this old lady, of observing the state and condition of her mental faculties, was Mrs. Townsend, with whom she boarded. There being no doubt that, before her death, Mrs. Maverick's memory became seriously impaired, it is important to ascertain, with reasonable precision, whether Mrs. Townsend can specify with certainty any positive indications of mental infirmity previous to the execution of the will. The testimony of this witness opened with a general statement, which, upon more critical inquiry, became much modified. She expressed broadly the opinion, that the old lady was very imbecile—quite a child in every respect— when the will was executed. Mrs. Maverick came to live with her in March, 1848, and the will was executed in June following, about three months after. She says, "Her mind was much clearer when she first came than afterwards, but still I don't think she had much mind." . . "I think the faculty mainly impaired was her memory."

Upon further inquiry, Mrs. Townsend admits that her memory was not all gone, and that in regard to events which occurred in early life, she spoke with clearness and intelligence. Finally, the only point she was able to specify as indicative of loss of memory prior to the execution of the will, was that she forgot the decease of her son, Samuel, and his wife, Clara. "She never from the first appeared to remember that her children were dead." "With this exception, I don't think I recollect any other circumstance indicating childishness, loss of memory, or imbecility, before the execution of the will." It is not at all improbable that Mrs. Townsend, after the lapse of several years, may be mistaken as to the time when this circumstance occurred, especially as there was no connecting fact to fix the date. The memory of the witness failed in other particulars quite as likely to be impressed on the mind; one occurring shortly before, and the other shortly after the execution of the will. She forgot that she was the subscribing witness to a power of attorney executed by the decedent in March, 1848; and she post-dated, a whole year, a visit made by Mrs. Maverick to New Jersey, in July, 1848. On the other hand, Mrs. Townsend states circumstances tending to show that the old lady was not an utter imbecile. She says that she would often speak about her house in Liberty Street, and inquire in respect to the collection of the rents, and the alterations then being made in the premises. In April, after her sickness, and not before as Mrs. Townsend supposed, when Mr. Reynolds accounted with her for the sales of her furniture, she missed several articles, and called his attention to them. She often went out alone to see her friends. She went to the part of the city where she had formerly lived, and found her way around alone. She went to Mr. Reynolds' office alone, three or four times in the first year. She did her own mending, for a year. She made some quilts. She generally made her own purchases. Her sight was defective,

though good for her years. Her hearing was not at all affected. She was fond of hearing fictions and the newspapers read to her, and the Bible. She attended church once a day on Sundays. She did not forget Mrs. Townsend, or Mr. Reynolds, or any member of their families.

Mr. Ellsworth testified that, eight or nine years since, the deceased was run over in the street, and since that he thought she had become childish and simple in her conversation; he was unable, however, to recall any circumstance justifying this opinion.

Mrs. Osborn, who saw Mrs. Maverick frequently from 1837 to 1840, stated as instances of her bad memory at that time, that she forgot to pay her a dollar she had borrowed; was in the habit of making statements, and afterwards denying that she had made them. This witness considered the old lady childish; but this seemed to be her way of generalizing about aged people, for she says, " She was like all other old people, eighty years old; we consider them childish." She met the decedent eight years ago in the street, and she told the witness who, though not recognized, addressed her, that she had lost her way. With the exception of this single interview, the witness had not seen her for over eleven years.

Catharine Braman also thought the decedent childish. She had seen her but three times in eleven years. She stated the circumstances which occurred at the first two interviews; but I think them immaterial. The last interview was eighteen months after the execution of the will, and is therefore unimportant.

Mrs. Johnson thought her memory " very poor," though " her conversation was very good." Her acquaintance with the decedent commenced in 1848, and she only met her casually; and it was not at all remarkable that Mrs. Maverick " could not remember her from one week to another."

Mr. and Mrs. Warner saw the decedent in the summer

of 1848, and were of opinion that her mind and memory were failing, because she repeated the same questions after they had been answered.

Angelica Maverick, Mrs. Townsend's sister, testified to many circumstances showing mental imbecility. For example, she states that in 1848, the decedent spoke of having been run over, a fortnight before. She also says Mrs. Maverick could not distinguish between her husband, son, and step-son; would frequently inquire whether her husband was living, and speak of her son as though he were her husband, forget he was dead, or ask if he was living. It does not appear with precision when these facts occurred. On the other hand, the witness states that the decedent in 1848 made some purchases, generally went alone to Mary Maverick's, in Carmine street, and sometimes alone to church. She spoke of her house, in Liberty street, and the rents; and in the fall of 1848, the witness thought she had mind enough to make a gift of $20 to Mary Maverick. The witness was present at the execution of the will, and says it was read in such a hurried manner, she could not understand it. The subscribing witnesses testify that it was read with deliberation. She also stated that the fire at Mary Maverick's house, in Carmine street, occurred, she thought, in 1849, but did not recollect; could not say at what period of the year, whether it was before or after the will was made, though she thought it was about that time. She had forgotten that in 1849 Mr. Reynolds paid money to the decedent in her presence, though on being shown the receipts of two payments she admitted she had signed them.

Dr. Pratt, the medical attendant of Mrs. Maverick for the last ten years, testified to various circumstances showing decay of mind and memory ; but he was quite clear she had sufficient capacity to make a will prior to a sickness at which he dates a decided failure in her mental powers. On his first examination he mentioned only an

attack in the spring of 1848, from which he thought she recovered so as to get out the last of April or in May. After consulting his diary, and on his second examination, it appeared that in 1850 he was called in to see the decedent on the 20th of March, and visited her daily to the 29th inclusive ; and also on the 3d and 15th of April. In 1848, he visited her nine consecutive days, and he states her disease was inflammation of the lungs. In 1850, he made twelve visits, extending over a period of 26 days, and yet had entirely forgotten it ; and, though not certain, thought she had a disease of the bowels. The doctor also forgot that he had been paid a bill for attending Clara Maverick, and that he had been paid a bill for attending the decedent, in 1850. He admits likewise, " when asked about matters of four years' date, I am sometimes staggered about dates, unless I consult books."

On the other hand, the doctor stated that the deceased always knew him, to the day of her death, and that he never discovered any idiocy, but only the loss or failure of memory, till the last stages of her life. She often spoke to him of her house, the rents, and the loss of money by one Kirk, in 1848 or 1849. He met her alone in the street, in 1849, going to see Mrs. Torboss ; also in 1850 ; on both of which occasions she spoke to and recognized him. He says that prior to his first examination he called on Mrs. Townsend, to refresh his memory and get dates, to save himself the trouble of examining his books. It may as well be stated in this connection that Mrs. Townsend testifies that the disease of Mrs. Maverick in 1848 was a violent cold and cough, and that she was confined to the house three or four weeks. .

Mrs. Malcom, who was in the habit of seeing the decedent frequently, testified that she had not " heard her make use of a sensible remark in seven years, if not longer." . . " As long as I can bring my memory to bear, she has been childish, but not as much so formerly

as during the last seven years. . . In my opinion, she was childish twenty-five years ago. Her actions were generally childish. She would sing childish and foolish songs, and tell foolish stories which I considered unbecoming for a woman of her years, and the people would all laugh at it. I recollect the subject of one of these songs; that was 22 or 23 years ago. . . Her memory was entirely gone. . . Her conversation was childish, weak, simple, and unconnected. At the end she would not be conscious of what she was saying, and would repeat it. She would talk sometimes of getting married, of having a beau, that she was a young woman of thirty-two years of age, just ready to be married. Sometimes she would fancy she was making ready to be married." . . "She forgot she had paid for purchases; and in two minutes after, you could make her pay over again; you could make her believe she had paid and had not paid. I hardly think that in seven years she was conscious of what she was doing. She would not know where she was going. If you would send her out, she would lose her way. She was generally accompanied by one of her grandchildren. I have taken her home, and by the time I got there she would not know who I was, would think I was a stranger; once I asked her to lend me an umbrella to return with, and she said she did not know me, and she would lose her umbrella," &c. Without stating more minutely, it is sufficient to say that the statements and opinions of this witness, if uncontroverted, are quite enough to show great imbecility. On inquiring into the dates of some of these circumstances, however, it appears that the refusal to lend the umbrella occurred within the last three years; another in respect to buying two new bonnets, within two or three years, and another in the fall of 1848. On her direct examination this witness stated, that the decedent "wore caps, with red, pink, and blue ribbons." On her cross-examination she said "she did not, but could be per-

suaded to." She said, "her hand shook so she could not sew." Mrs. Townsend proves the reverse. She gave the idea that the decedent lost her way whenever she went out alone. This is contradicted by many witnesses. She says "she did not know where she was living, whether in Troy street or Liberty street; more than half the time, could not tell the lady's name she was living with." Other witnesses show she knew well with whom she was residing. She says, "she would not know her children or her grandchildren." She had no children, and it is proved she did know her grandchildren. She says, "you could not make her sensible, her son and grandson were dead." It is shown that as late as 1849, she did know her son was dead. She says that in February, 1848, after Clara died, she asked her where she was. Several witnesses prove she was quite sensible of the loss of her daughter-in-law, and made it the subject of conversation.

I will now consider the evidence in favor of the testamentary capacity of the decedent. Mrs. Malcolm was the only witness who undertook with any decision to question it, prior to the death of Clara Maverick, in February, 1848; but as her opinion respecting the childishness of the decedent previous to that time was quite as confidently expressed as in regard to her mental condition subsequently, it is of consequence, in judging of her correctness as to the latter period, to see how far the evidence in the case sustains her as to the former period.

The Rev. Dr. Berrian, whose church she attended before her removal to Troy street, states that he generally visited her once a year, and that he saw her during her sickness in 1842. Her conversation then, was devout and pertinent. He never observed any mental decay, but on the contrary, thought she was rather a remarkable person for her age.

Dr. Maxwell, who attended as a physician in Samuel and Clara Maverick's family from 1844 to 1847, test-

ified that he never observed any indication of weak or unsound mind. He thought her about seventy years old, and on hearing her age, considered her a remarkable woman at that time.

Mr. Stokes, a neighbor for many years, thought she was a wonderful woman for her age. He left the neighborhood fifteen years ago, and since then has only seen her in the street. He had not met her for the last ten years.

Mr. Wyckoff knew her, from 1818 till she left Liberty street. He was frequently in the house, and conversed with her previous to Samuel's death. He thought her mind very good, and never discerned any failure.

Mr. Dugan knew the decedent over twenty years; was intimate in Samuel Maverick's family, and conversed with the old lady very frequently. He says, " I thought she was a remarkable, intelligent, smart woman. During the time I knew her, I discovered no change of intellect. Her memory was remarkably clear, and I considered her very smart for a woman of her age. My opinion was founded on general conversation, as well in regard to present as to former occurrences, and I never discovered any change in her intellect, from my first to my last acquaintance with her." His conversations with her, do not appear to have continued later than two years prior to Clara's death, though he saw her subsequently.

Mr. Freeman, who saw the decedent occasionally at Mr. Reynolds' office, from 1840 to 1842, and three or four times since, prior to Clara's death, expresses the opinion that she was a clear-headed old lady.

Mr. Nexsen boarded at 85 Liberty street, for a year, about 1841, and was very intimate in the family, to the time of Clara's death. He went up into the old lady's room when he called. He says, " I considered Mrs. Rebecca Maverick a very remarkable woman for her age, in respect to her mental capacity and everything. In respect to liveliness, she was almost like a young woman. I never

saw an old lady of her age, who went around the house and about the street, as she did alone." . . "I never discovered any decay of intellect, or any change in her, during all my acquaintance. I spoke to her at Maria's funeral (April, 1848), and she remarked to me that her children were all going before her."

Maria and Margaret Johnson, who boarded at 85 Liberty street, in 1847, from June to October or November saw and conversed with Mrs. Maverick, frequently. They thought her very sensible; observed no failure of memory. She sewed, made her own bed, sometimes went out alone, spoke about her son Samuel, collected her own rents. Margaret Johnson spent nearly an hour with her the day before Clara died, and discovered no change of mind.

Mr. Griswold visited at the house frequently; and the latter part of 1847, and the first of 1848, to the time of Clara's death, very often. He thought her "an extraordinary woman, physically and mentally," and "never discovered any failure of memory." Mrs. Griswold was also a frequent visitor; and shortly before Clara's death, she was at the house very often—at all times of the day and evening. When Clara died, the old lady told her she had lost her best friend. She says, "In respect to her capacity, during all my acquaintance with the decedent, I thought her very remarkable. I never discovered any weakness of mind in her. I do not remember discovering any failure of memory." She also states that she frequently saw the deceased go out alone. Mrs. Nellis, an old acquaintance of Mrs. Maverick, stayed a couple of days with her at the house in Liberty street, after Clara's funeral. She slept with her. She said, "that when Samuel died, she had Clara left to take care of her; but now she is gone, I have nobody." This witness says her mind was good, and she never noticed any failure of memory.

Mrs. Torboss, for many years a neighbor of Mrs. Maverick, states that up to the time of Clara's death, "her mind

and memory were very good." She called at the house of the witness that summer (1848), and said she was going to see her grandchildren in New Jersey. They had considerable conversation together, and the witness discovered no change of mind or memory. She saw her again in 1850, and then perceived her mind had failed.

Mr. Johnson, of Godwinville, New Jersey, testified that, in July and August, 1848, the decedent stayed some weeks with Dr. and Mrs. Hilton, who lived in the same house with the witness, at that place. He conversed with her frequently and at length, and mentions several of the subjects of conversation. He says, " She related a number of transactions that had occurred, with more accuracy than I had derived them from history." " I thought at the time she was a woman of remarkably strong mental powers, and that her physical developments were in a good state." " I did not discover the least appearance of decay of mind. I observed there was no incoherence in expression and language. She seemed to be very clear in her ideas and views, and I thought very distinctly clear in her expression of them. I don't think I discovered any failure of memory, in any of our conversations." " Philip and Clarkson Maverick, whom I understood to be her grandchildren, were boarding with Dr. Hilton at the time. She acted as if she knew them, and she took a particular interest in them. She gave me quite a full account of the pedigree and family connection; but I have no recollection of the matter, from the fact that it was so mixed up, I could not keep account of it." " She never told me the same story over again, without my calling up the subject. I don't remember her showing anything of that kind. She seemed to recollect distinctly what she had said—the conversation that had transpired." Mr. Johnson states that he thinks she returned to the city by railroad, alone ; that she was fond of hearing the papers read, and interested in the news ; that she spoke of the Pilgrim's Progress, and its style ; alluded

to the improvements in New York—the Croton water, and its advantages—the University, and the facilities for education—Trinity Church, its wealth, and the litigation as to its property—the loss of the steamer Atlantic, then a recent occurrence ; and that she was as ready as he to lead off on all topics, and expressed herself with fluency.

Mrs. Concklin, who was staying at Mr. Johnson's house at the time of the decedent's visit, states that she came alone with a driver from Paterson.    She saw her frequently, and thought her "a very smart woman for her age.    I saw no sign of forgetfulness about her.    I did not notice her telling the same story over again. . . . I did not hear her repeat any question she had asked.    She recognized me whenever she saw me.    When she asked after Mrs. Johnson, she would call her by name."

Thomas B. Townsend, a son of Mrs. Cornelia Townsend, who lived with his mother while Mrs. Maverick resided with her, states, in the most unqualified manner, that during the first year she lived in Troy street, "her mind and memory were good. · They appeared to be always good during that year.    I never noticed anything to the contrary.    I make the same statement as to the year 1849. I think her memory was very good both years.    It failed somewhat after we moved to Greenwich avenue, May, 1850, but not so much as during the last year of her life. It was scarcely to be noticed during 1850."    Mr. Townsend says that he talked with the old lady more than any other member of the family ; he accompanied her very frequently when she went out ; and was in the habit of reading newspapers and books to her.    He says, " Her conversation was sensible for the first two or three years after she came to our house.    Her conversation was not silly or childish until the last year of her life.    The principal thing, even then, was loss of memory, or partial loss.    I can't recollect any the least failure of memory in 1848 or 1849."    " I never observed that she failed to recognize any person in

1848 or 1849 ; or that she forgot the names of any persons ; or that she repeated questions that had been answered. I can't recollect that she ever repeated the same story without being asked."

In addition to this evidence, there is the testimony of the two subscribing witnesses to the will, and of Mrs. Everett, Dr. and Mrs. Hilton, Mr. and Mrs. Burke, and Mrs. Wheeler. As all these—except one of the subscribing witnesses, Mr. Dewey—are connections of Mr. Reynolds, the executor, and of the children who are the beneficiaries under the will, I do not propose to examine their opinions in detail ; not from any doubt as to their correctness, but because the proof is sufficient without them. They state a series of facts, however, that are important.

Mr. Burke testifies, that in September, 1850, Mrs. Maverick came alone to No. 85 Liberty street, saying she had called to look at the house. She examined it, saw that the rear was cracked, and observed that it had been so for some years. He accompanied her to the residence of Mrs. Torboss, and afterwards called and saw her into a stage. She told him the line of stages, and how to mark them.

Mrs. Hilton states, that in the summer of 1848, at Godwinville, the decedent packed and unpacked her trunk, when she came and left. She dressed and undressed herself. She knew Samuel and Clara were dead ; was perfectly aware she was boarding with Mrs. Townsend. That in 1849, when the witness lived at the Dispensary, she came to the house alone, twice. That she never knew her to fail in recognizing any one ; and that on her death-bed she recognized her. Dr. Hilton says she knew him always, even to the last. Mrs. Everett states that to the time of Clara's death, she rented the house and collected the rents herself. That in June or July, 1848, the decedent visited her house ; and at that time spoke of the death of Clara and Samuel. Mrs. Wheeler testified she saw the deceased at the funeral of Maria Louisa Maverick (April 20, 1848), and that " she

spoke of the change in the family in a few years, and that she had lived to bury them all." Mrs. Burke states that in February, 1849, at a dinner party at her house, the deceased spoke of the death of Samuel and Clara; and on the ensuing day, she accompanied her to the house of Mrs. Mary Maverick. She told the witness, who did not know the locality, it was in Carmine street, and went there with her, and identified the house without any difficulty. Mr. Dewey testified that, in 1848 or 1849, the decedent called at the office in relation to a claim she had against an old tenant; told him where she had heard he lived; and that she afterwards came again on the same business. In June, 1848, she also called at the office alone, in regard to the alterations made by Mr. Rathbone, on the rear of the premises in Liberty street. Mr. Dewey and Mrs. Phillips were the subscribing witnesses to the will. The latter says, though she observed some signs of forgetfulness in the deceased before the execution of the will, she thought her mind sound and her memory pretty good. The former, who had lived in the same house with Mrs. Maverick for a year, says her mind was sound; and though in regard to recent events in which she had no interest, her memory was defective, yet as to recent events in which she had an interest it " was remarkably good."

In respect to her testamentary intentions, I think the evidence very conclusive. Catherine Braman relates that, eleven years ago, she heard the decedent speak of leaving property to Howell Maverick and his children. Mrs. Osborn testifies that, twelve years before her decease, she told her granddaughter, Mrs. Harris, she would not forget her and her children; they should never want anything whilst she had a dollar; that Clara had not treated her well, and she would not leave her children anything. This is the only trace of any difficulty ever existing between the deceased and her daughter-in-law; and if there was any in fact, the evidence shows it must have been soon obliterated. The

proof is very full that she was tenderly attached to Clara and her children, the former of whom was united to her by the double tie of niece and daughter-in-law; and with all of whom, for many years, she had resided in the same house. It is possible that at the period spoken of by Mrs. Osborn and Mrs. Braman, she may have designed distributing her property among all her grandchildren; but it must be remembered that her son was then alive; and that in 1842 she made a will giving him all her estate, and in case of his decease devising it to Clara. If she ever had a contrary intention, then, it could not have existed long before it was changed. Mrs. Townsend testified that the morning after the will of June, 1848, was made, she asked her what the paper was she had signed, and she said she did not remember, only she was told by Mr. Reynolds it was her last will and testament. At Mrs. Townsend's suggestion, she subsequently spoke to Mr. Reynolds repeatedly on the subject, until finally he stated what it was; and then she was satisfied. It is very evident that Mrs. Townsend was unable to give the correct purport of Mr. Reynolds' statement, or that he gave an absurd answer; and I see no reason to suppose the latter. Angelica Maverick also says that she asked the decedent what she had been signing, and she said Mr. Reynolds told her it was her will, but she knew nothing further about it. On being asked if he "had willed away her money to Clara's children? she replied that if he had, it should not stand so; she would go immediately down to his office and have it rectified." It does not appear that she ever did; and yet it is plain enough she knew it was her will.

On the other hand, Mrs. Nellis states that when she stayed with Mrs. Maverick after Clara's funeral, she said, "I am getting old, and I cannot keep house any more, and I am too old to bring up these children." The witness said Mr. Reynolds would see to that, and she answered, "Yes; and he shall have all I have to take care of them." Mrs.

Nellis also testified that after the death of Mr. Howell, Mrs. Maverick said, " Mr. Howell has left each of his grandchildren a thousand dollars apiece, and when I die, Clara's children shall have all I have."

Mrs. Townsend says she often heard the decedent say she intended to give her property to her grandson Philip (one of the devisees), before and after she executed her will.

Mr. Burke states that in 1849, she told him " that inasmuch as the first children of her son Samuel, by his first wife, had had something from their grandfather Howell— somewhere about a thousand dollars apiece—she thought it no more than right that Clara's children should receive as much, so as to equalize." He asked her whether she had made a will; she replied she had; Mr. Reynolds had drawn it, and had it in his possession. He adds, " She did not say how she had made the will; she was a woman who I do not think would have told." Mrs. Burke corroborates this statement substantially, though she says the decedent said, " she had left her property to Clara's children."

Mrs. Everett testifies she often heard the decedent, when Philip and Clarkson asked her for money, say she intended to keep it for them till she was dead, and then they would have the benefit of it.

Mr. Dewey, a subscribing witness, states that at the time the will was executed, and Mr. Reynolds asked her if she wished any alterations, she replied in the negative, adding, " It gives the property to Mrs. Maverick's (Clara's) boys; and I want them to have it, because the girls have been provided for."

Finally, Thomas B. Townsend testifies that before the execution of the will, she spoke of her intention to leave her property to these children, and after the will was made, she said she had given or willed it all to them.

The circumstances attending the execution of the will are worthy of consideration. It was done at the house of the executor, Mr. Reynolds, in the presence of the subscrib-

ing witnesses, and Mrs. Townsend, Mrs. Reynolds, and Miss Maverick. The witnesses were called into the back parlor by Mr. Reynolds; the will was read audibly and deliberately; questions were asked, and explanations made; and it was duly executed. There was not only no clandestinity, but unusual publicity.

Under all the circumstances, I can see no reason why this instrument should be denied probate. The evidence very clearly shows that the decedent was sound in mind and memory, and with faculties unimpaired, at the decease of her daughter-in-law in February, 1848. The will was executed within four months after—a period not sufficient in the ordinary course of nature for any material and decided decay of mental power, unless on the supervention of some extraordinary circumstance. A serious attack of sickness might have hastened such an issue; and if Dr. Pratt were not mistaken in dating his observation of her failing memory at the illness in April, 1848, that fact would be very material in reaching a just conclusion. That he may be in error in this respect, is manifest from his having altogether forgotten a longer, and as Mr. Townsend states more severe sickness, at about the same period of the year in 1850. He recollected only one sickness, and had an interview with Mrs. Townsend as to the time, and finding it had occurred in 1848, that circumstance together with his forgetfulness as to the sickness of 1850, must have had some influence in leading his mind to the conclusion he came to. In 1848, he first visited Mrs. Maverick, April 1st, and he thought she was out the last of April, or some time in May. It is in proof that she attended the funeral of her granddaughter, Maria Louisa Maverick, in Robinson street, on the 20th of April. I have no doubt at all, that Dr. Pratt is correct in his statement that he observed a failure in the capacity of the decedent as a consequent upon an attack of sickness; but as the general tenor of the testimony tends to show that her mental powers

remained in a fair state of preservation until 1850, and the observation of many witnesses placed the decline of her memory in that year, I cannot but think that the attack in 1850 must have been the sickness after which he noticed her mind failing, and not that of 1848. This is the only way of reconciling his statements with other circumstances well established ; and upon any other hypothesis, the weight of evidence is against him.

It is true, the decedent was a very aged lady. But, with a physical constitution of unusual vigor, her mind up to the year 1848 had also maintained remarkably its strength and tone. One witness testified that she was childish twenty-five years ago, but among all the witnesses she stood alone in this opinion. She speaks of light and frivolous remarks made by the old lady ; but it is easy to misconstrue or mis-understand pleasantry and vivacity. This venerable lady was baptized by the Rev. Dr. Berrian in 1831, at the age of seventy-three, and 'appears to have continued a faithful attendant on the ministrations of the church. Nothing has fallen from any of the witnesses, except this one, indicating unbecoming deportment. It is worthy of remark that per-sons attaining great age often possess a large degree of that cheerful and lively manner which characterises youth, and which probably in them contributes greatly to a green old age, when others not so old and possessing less of this sprightliness and vivacity appear more decrepid and stricken in years. It is not difficult to misconceive these qualities, and to characterize them as childish ; and as there is great danger of being censorious and captious in such a judgment, the mere opinion of a single witness on such a point cannot be very material, especially when no one is found to agree with her.

There is satisfactory evidence, then, of the testamentary capacity of Mrs. Maverick in June, 1848. Six years before, she had made a will giving her estate to the mother of these children, in case of their father's decease. The

small legacies to the other children, judging from her statement, had probably been paid. The will of 1848 is in harmony with this previous devise, and in furtherance of the same purpose. It accords with her intentions as expressed to a number of persons before and after it was executed. In view of her other grandchildren, who were adults, having received some provision from their grandfather, it was not unreasonable she should desire to place these minors on an equality. She gives them one seventh of the house where she had resided, and where they had been brought up. Their mother was dead, and they were left to her care : she expressed and doubtless felt for them great affection and solicitude. The will containing her wishes was executed in the most open manner,—it was read aloud and explained, and there is no sign of concealment, influence, or deception. If, as stated by two of the witnesses, the old lady forgot the contents, almost immediately, I am satisfied she had the mind to understand the purport of the instrument at the time, and did understand it, and the will accorded with her wishes. It was her will. Besides, it appears very clearly that long after, she knew what she had done very well, and spake of it to those who were friendly to the children; while it is very likely that to escape importunity from others, she may have put them off as best she could. She died leaving this instrument undisturbed.

Great age alone does not constitute testamentary disqualification; but, on the contrary it calls for protection and aid to further its wishes, when a mind capable of acting rationally, and a memory sufficient in essentials, are shown to have existed, and the last will is in consonance with definite and long-settled intentions, is not unreasonable in its provisions, and has been executed with fairness. The weight of proof is in favor of the will on these points, and sentence of probate must therefore be decreed.