NEW YORK COUNTY.—HON. D. G. ROLLINS, SURRO-
GATE.—February, 1884.

## CORNWELL V. RIKER.

*In the matter of the probate of the will, and codicils
thereto, of* SARAH BURR, *deceased.*

The questions of fact, whether decedent, at the time of the execution of a
   codicil to her will, was possessed of testamentary capacity, and
   whether that paper expressed her own untrammeled wishes respect-
   ing the disposition of her estate, examined at length, and determined
   in the affirmative.

The fact of senility raises no presumption of the existence of dementia.

The question of testamentary capacity is simply whether a decedent was
   capable of sufficient thought, reflection and judgment to know what
   property he had, and to decide and declare what should be done
   with it.

An inmate of decedent's family having testified in disparagement of her
   mental capacity, and having named other persons who, he stated,
   could confirm his testimony, but who were not called, it was con-
   tended, on the one hand, that contestants' failure to produce these
   persons justified an inference against the truth of the witness' story,
   and, on the other, that his testimony should be credited because
   proponents did not produce those who could have disproved it, if
   false.—

*Held,* that no presumption arose either way.

The proper method of weighing the unsupported statements of a witness,
   viz.: by an examination as to their inherent probability, their con-
   sistency with each other and with other facts proved, his intelligence
   in observation and in reporting the results thereof, his apparent
   freedom from bias, and his known character for honesty—pointed
   out.

The proffered assistance of distinguished alienists, upon the question of
   decedent's testamentary capacity, rejected by the court because of
   their assumption of the truth of certain hypotheses touching her
   character and conduct which, it deemed, were not proved to be well
   founded.

Children's Aid Society v. Loveridge, 70 *N. Y.*, 394—compared.

The successful impugnment of an alleged will, on the ground of undue

influence, involves, generally, the demonstration of one or more of the following propositions : (1) That the provisions of the rejected paper are inconsistent with decedent's previously expressed intentions. (2) That those provisions are unnatural or unfair, in ignoring such claims of kindred as ordinarily receive testamentary recognition. (3) That from those provisions the person exercising the influence derived, directly or indirectly, some advantage.

*It seems,* that the object specially sought to be accomplished by the statute of distributions is to divide an intestate's estate according to that plan which appears most accordant with the dictates of natural affection.

PETITION for the probate of decedent's will presented by Samuel Riker, named therein as executor; opposed by John H. Cornwell and others, heirs at law and next of kin. The facts appear sufficiently in the opinion.

JOHN E. PARSONS *and* E. R. DE GROVE, *for proponent.*

EDWARDS PIERREPONT; F. & C. A. H. BARTLETT ; N. D. LAWTON ; STANLEY, CLARKE & SMITH ; G. E. P. HOWARD ; EDMOND HUERSTEL, *for contestants.*

B. F. WATSON ; W. H. GREENE ; H. P. McGOWN ; M. S. ISAACS ; DEVELIN & MILLER ; H. D. SEDGWICK ; SULLIVAN & CROMWELL ; LAUTERBACH & SPINGARN ; A. J. DELANEY; SEWELL & PIERCE ; DAVIES, WHITEHEAD & SUYDAM ; JOHN SHERWOOD ; W. H. HOPPIN, JR.; CHARLES E. TRACY; JOHN HARDY ; LEWIS L. DELAFIELD; CHARLES E. WHITEHEAD ; B. S. CLARK ; SEAMAN & CONGER ; R. H. LYON ; CHAS. RUSTON ; M. M. BUDLONG ; HOPPIN & TALBOT; W. M. POWELL ; H. B. HATHAWAY ; T. C. CRONIN ; DE FOREST & WEEKS ; MILLER, PECKHAM & DIXON ; WHITLOCK & SIMONDS ; STEARNS & CURTIS ; BENEDICT, TAFT & BENEDICT, *for beneficiaries.*

THE SURROGATE.—In March, 1882, there were propounded in this court three written instruments, which, taken together, were claimed to express the testamentary purposes of Sarah Burr. Of these instruments, that which bears the earliest date purports to be her will. Each of the others professes upon its face to be a codicil to the first. In behalf of certain heirs at law

and next of kin of decedent, objections in writing were formally interposed to each of these several papers. It was claimed that they should be denied probate :

First. Because of non-compliance with the requirements of law respecting the formalities of their execution.

Secondly. Because of mental incapacity on the part of the decedent to give them effect as testamentary dispositions of her estate.

Thirdly. Because of the exercise of undue influence and the resort to circumvention and fraud, whereby, if admitted to probate, they would accomplish not Sarah Burr's purposes, but the purposes of some designing person or persons by whom she was unlawfully guided and controlled.

The questions thus raised by the petition for probate, and the answers thereto, have been tried before the Surrogate, and the report of the testimony introduced by the contending parties covers more than 1,200 closely printed pages. A year elapsed between the day when the trial began and the day when its issues were formally submitted for my determination. Because of the grave importance of those issues, and the unavoidable delay in their presentation, I have felt unwilling to pass upon them until I could find an opportunity, such as has but lately been afforded, for a careful re-examination of all the evidence. The case has long been under advisement, therefore, though it has at no time seemed to me to present very embarrassing or complicated questions, either of law or of fact. The disclosures of the testimony, and the action of contestants' counsel thereupon, have greatly narrowed the field of inquiry

covered by the pleadings, and justify me in declaring at the outset, without stating the grounds of my conclusions, that the papers propounded as the will and the first codicil are entitled to be admitted as such to probate, and that, as regards the instrument purporting to be the second codicil, its execution, so far as concerns mere statutory formalities, was in substantial accordance with all the requirements of law. The only matters, therefore, which are practically in controversy are these:

I. Was the decedent, at the time she executed this second codicil, possessed of testamentary capacity? And if that inquiry be answered in the affirmative, then,

II. Does that disputed paper express her own untrammeled wishes regarding the disposition of her estate.

It is well, perhaps, before discussing either of these questions in detail, to state certain facts which have a common bearing upon both.

Sarah Burr was born in November, 1794, and was, therefore, at the time of her death in March, 1882, above eighty-seven years of age. She had outlived all her near kindred. Her parents had died many years before; her only brother in 1831, and her last surviving sister in 1865. When she subscribed her name to this codicil, there was no person living except herself who was a descendant of either of her parents, nor, so far as the evidence discloses, was there then living any child or grandchild of any of her grandparents. Her father, Isaac Burr, had died in 1829, leaving, besides personal assets inventoried at $12,000, certain pieces of

real property, including a tract of land between Fortieth street and Forty-third street in the heart of this city, which proved to be the nucleus of the great fortune whose disposition is here in controversy. From this tract, which Isaac Burr used to call his "pasture. lot," his children reaped no advantage until long after it came into their possession ; scarcely any, indeed, until the year 1850, when Sarah the youngest was fifty-six years of age, and Margaret the eldest was sixty-four. Meanwhile, they had been obliged, from time to time, to borrow money upon interest, that they might carry the burden of taxes and assessments, and were doubtless compelled, whether such a course accorded with their wishes or not, to practice habits of frugality and economy, such as were displayed by Sarah at least to the very close of her life.

On the 11th of August, 1862, the eldest daughter Margaret, who had then reached the age of seventy-six, executed her will. She had never married, nor had either of her sisters, of whom one was then seventy-four, and the other sixty-eight years of age. To those sisters and the survivor of them Margaret gave a life interest in her entire estate, and, after their death, the remainder as follows : To twelve persons, her relatives and friends, divers sums, amounting in all to $67,000. To seventeen charitable, religious and educational societies, which she specified, other sums aggregating $230,000. To five societies, included among such seventeen, the amount then remaining, after first deducting $5,000 for each of three of the executors of the will. This instrument was admitted to probate in October, 1862.

Mary Burr executed her will in March, 1864, and a codicil thereto in September of the same year. These instruments, both as to the form of their dispositions and as to their spirit and substance, were closely imitative of the will of Margaret. In substantially the whole estate Sarah was given a life interest. The remainder was ordered to be applied to the payment of a long list of legacies. About $100,000 were bequeathed to relatives and friends, and nearly $300,000 to twenty-five public institutions, five of which were made the beneficiaries of the entire residuary estate. This will and its codicil were admitted to probate in August, 1864.

The will of Sarah Burr is dated April 3rd, 1866. It directs the distribution of $87,000 among certain of her relatives and friends, and $285,000 among twenty specified religious, benevolent and educational societies. It makes six of such societies residuary legatees. June 30th, 1869, is the date of decedent's first codicil. By the first clause of that instrument, she gives in trust to her executors the sum of $200,000, for the establishment of a Good Samaritan dispensary for the benefit of the poor of the city of New York. After disposing by other clauses of considerable sums of money, she bequeaths to certain specified charitable and religious institutions the sum of $100,000. The so called second codicil, which is here the subject of controversy, was executed on September 30th, 1881. It begins with the following preamble: " Whereas my residuary estate has largely increased since the making of my will and of the first codicil thereto, and many benevolent institutions have been created in the meantime ; now, in order to carry out more widely the charitable and religious purposes

intended by me, I do hereby, out of my personal estate and the proceeds of my real estate, give and bequeath the sums following." Then comes a list containing the names of fifty-six societies, and allotting among them legacies of well nigh a half million of dollars. Thirteen of these fifty-six find place among the twenty legatees of the residue, which is wholly bestowed upon public institutions.

It is convenient at this point to note some of the circumstances attending the preparation of this paper. These circumstances, so far as they are known to Mr. John H. Riker, are very fully disclosed in his testimony. For many years before decedent's death, he acted as her legal adviser, and possessed her fullest confidence and regard. At the immediate request of Mr. James H. Titus, whose connection with the Burr estate and with the existence of this codicil will be hereafter considered, Mr. Riker, in April, 1880, called upon the decedent at her own house. He said to her, at the beginning of an interview lasting nearly an hour, that he had been told that she had expressed a wish to see him in relation to drawing a second codicil to her will. She answered that such was the fact. Her estate, she said, had grown so large since the date of her will, that she thought its accumulations ought not to be restricted to the few institutions specified in that instrument, but that other charities should be added to the list of residuary legatees. Upon being asked what others, she replied that she was confined to the house much of the time, and knew little, therefore, of what was going on outside of it ; that since she had made her will there had been founded, in the city of New York, many

good charitable institutions, but that, as to their names and objects, she was not well informed. Mr. Riker said to her that there were books descriptive of local charities which he would get for her if she wanted them. She told him to do so. He then suggested the propriety of her increasing the personal legacies, but his suggestion was disapproved. She said that all her nearest relatives were dead, and that she did not care to increase the gifts to her more distant ones. And to this notion she adhered, in spite of Mr. Riker's urging that some of her kindred were in moderate circumstances, and that a gift to them would be in strictest sense a gift to charity. "No," she insisted, "I don't wish to increase the gifts to my relatives. I would rather give the increase of my estate to public charities." Later in the interview she said she had been told by Mr. Titus that the accumulation amounted to several hundred thousand dollars. She inquired what the fact was. Mr. Riker answered that, in his belief, the increase was nearly a million dollars. No mention was made at this time of any particular institution as worthy to be included in a new testamentary paper. About ten days later, having meantime obtained the books of which he had spoken and left them at Miss Burr's, Mr. Riker called upon her again, and had with her another conversation of an hour's length. She told him that she had examined the books, but that they told her a long story and that it was a little difficult for her to select from them the institutions to be benefited by her codicil. She repeated a remark which she had made at the previous interview, that she especially wished to give to those socie-

ties which provided for the sick and needy and for women and children. She asked Mr. Riker to make inquiry respecting such institutions and report to her the result. At this stage of their interview they were both seated. Miss Burr arose, caught Mr. Riker by the hands, and then sitting down by him said—"I wish that, in this matter, you would give me your best judgment and advise me as if you were a brother." This he promised to do, and at her request promised also to make a list of such charities as would be likely to commend themselves to her approval, resorting for that purpose, not only to the books which he had submitted for her examination, but to such other avenues of inquiry as were open to him. The results he agreed to submit for her consideration. Soon after, he prepared a list and inserted it in a draft codicil, which commenced with the same preamble that appears upon the paper here in dispute. This draft he sent to Miss Burr, or left with her, on or about the 13th of May, 1880. Later in the same day, he again called at her house and had with her another conference of about two hours' duration. He first read the preamble which she pronounced satisfactory. He then named in their order the institutions he had thought fit to recommend as legatees, and the amounts he had tentatively allotted to them. In the course of conversation, reference was made to the fact that, by her former testamentary papers, or by those of one or the other of her sisters, this or that institution named had fared thus and so, and this circumstance was thought worthy of consideration in determining whether such institution should again share in the bounty of the Burr estate, and if so to what extent.

As the various societies were named by Mr. Riker, Miss
Burr occasionally made objections.  She at first pro-
tested against the inclusion of the Mount Sinai Hospital,
saying that she understood it limited its charities to
Jews.  Mr. Riker assured her that in this she was in
error.  She said:  "Do you mean to say that, if a
Christian was injured and taken into the Mount Sinai
Hospital, they would take as good care of him as if he
were a Jew?"  He said they would, and thereupon she
withdrew her objection and the bequest of $5,000 was
passed as approved.  When the name of the Hebrew
Orphan Asylum was called, she again dissented for a
time, but sanctioned the proposed bequest upon being
advised of the claims of that institution upon the
bounty of the rich and charitable.  A slight opposi-
tion, soon withdrawn, was aroused by the suggestion
of a $5,000 legacy to the French Benevolent Society.
Several of the dispensaries of the city whose names ap-
pear in the instrument now contested were brought to
Miss Burr's notice in this draft codicil.  It will be re-
membered that, for the establishment of an institution
with objects very similar, she had, eleven years before,
set apart a fund of $200,000.  When the names of these
various dispensaries were read to her, "Have you for-
gotten, Mr. Riker," she said, "that I gave to the Good
Samaritan dispensary by my first codicil?"  Mr. Riker
assured her that he did not, but explained in detail
why it was that that bequest could not be immediately
available, and how, meantime, the good it was aimed
to accomplish might be attained by affording help to
dispensaries already in operation.  This explanation
was accepted as satisfactory, and the proposed legacies

were allowed to stand. After the entire.list had been discussed, Mr. Riker announced the scheme he had devised for the distribution of the residuary estate. "Haven't I already given away all that I have to give?" said the decedent. "It seems a long list, and a great deal of money." Mr. Riker, after making computation, assured her that there still remained a surplus of several hundred thousand dollars; she thereupon gave her sanction to the proposed residuary clause, and the conference ended with her requesting Mr. Riker to prepare a codicil in conformity with the draft which she had thus examined and approved. This he proceeded to do, and on the day following, he took to her house the paper which he had prepared, and read her its contents. She declared herself satisfied with its provisions, and asked when it should be executed. The next day was suggested. "There is no need of hurry," said she; "I am in good health." And she named Monday or Tuesday of the following week. The day after this interview, Mr. Riker received from her a letter in these words, written by her own hand:

"MAY 15th, 1880.

DEAR SIR—Since I saw you, on further reflection, I have concluded to postpone the business on which we were conversing yesterday. When I have made up my mind on the subject, I will write you. Respectfully,

SARAH BURR."

Two months later, Mr. Riker rewrote the codicil in the form which it now wears. It differs in two particulars from the paper first prepared. It contains a provision, such as also appears in the will and in the first codicil, touching the disposition of legacies that for any

cause might lapse or fail to take effect, and it adds a single institution, the "Harlem Dispensary for Women and Children," to the number of the legatees. On several occasions between the day when he received from Miss Burr the letter above quoted, and the day when she signed the paper in controversy, Mr. Riker called to see her upon affairs of business, but he never made allusion, nor did she ever herself allude to the matter of the unexecuted codicil. Her renewed purpose to execute it, and her wish that he should make arrangements accordingly, were made known to him by Mr. Titus on September 29th, 1881, and led him to give Mr. De Grove and Mr. Jockel, gentlemen connected with his office, certain directions, with which on the succeeding day they proceeded to comply.

I have thus, as briefly as practicable, though necessarily at some length, reviewed the important and interesting testimony of Mr. Riker touching the connection of Miss Burr, so far as he is able to reveal it, with the preparation of the paper here propounded as her second codicil. Counsel for contestants accept this testimony, and I unhesitatingly accept it myself as a clear and trustworthy statement of the matters to which it relates.

On the morning of September 30th, 1881, Mr. De Grove and Mr. Jockel repaired to Miss Burr's residence. Their testimony of what took place is fairly summarized as follows: Upon their arrival, they were shown to the front parlor, where they were soon joined by Mr. Titus, and a little later by Miss Burr. To the latter, Mr. De Grove said he had come at Mr. Riker's request, bringing the second codicil, which he proposed to read aloud.

This he straightway proceeded to do, having first requested Miss Burr to interrupt him at any stage of his reading where she might fail either to hear or to understand. She did interrupt him in several instances, assigning the cause therefor. What she had not heard was read anew, and what she had not understood was explained. Her attention was specially called to the two particulars, wherein, as I have already stated, the paper read differently from the one Mr. Riker had submitted to her in May of the previous year. At the conclusion of the reading, she declared herself satisfied, and put her name to the instrument in a neat and graceful hand, which of itself gives no sign either of great age or of bodily infirmity.

So far as is disclosed by the evidence to which I have thus far referred, Sarah Burr's capacity to make a will in September, 1881, does not seem open to dispute. But it is urged by the contestants that the evidence as a whole warrants the conclusion that she was at that time in her dotage, unable to conceive or to execute a testamentary purpose. I shall proceed to review the evidence upon which this claim is based. In considering that evidence, it must be borne in mind:

*First.* That from the mere fact of her advanced age no inference can be drawn unfavorable to these proponents. This is a doctrine which has been frequently promulgated by the courts (Van Alst v. Hunter, *5 Johns. Ch.*, *158 ;* Clark v. Fisher, *1 Paige*, *171 ;* Comstock v. Hadlyme Society, *8 Conn.*, *254 ;* Andress v. Weller, *2 Green Ch.*, *604 ;* Collins v. Townley, *21 N. J. Eq.*, *353 ;* Horn v. Pullman, *72 N. Y.*, *276 ;* Humphrey's Will, *26 N. J. Eq.*, *513 ;* Maverick v. Reynolds,

*2 Bradf., 360;* Moore v. Moore, *2 Bradf., 261;* Leay-craft v. Simmons, *3 Bradf., 35;* Carroll v. Norton, *3 Bradf., 291;* Crolius v. Stark, *64 Barb., 112).* Cases are numerous wherein men and women much older than Sarah Burr have been held competent by our highest judicial tribunals, to execute testamentary papers. Statutes and decisions alike recognize, what is indeed patent to every observer, and found conspicuous illustration in the persons of many of the witnesses at this trial, that age affords no just criterion for determining the quality of the human understanding. No man can live so long as to be legally incapacitated by the mere lapse of years from ordering the disposition which shall after his death be made of his estate. Swinburne's enunciation of this doctrine (*part 2, sec. 5*) is sound law to-day: "A man may freely make his testament, how old soever he may be; for it is not the integrity of the body but of the mind that is requisite."

*Second.* That testamentary capacity is not, in the eye of the law, conditioned upon the possession of sound health or of great intellectual vigor or activity. Said the learned Judge who pronounced the opinion of our Court of Appeals, in Horn v. Pullman (*72 N. Y., 276*): "Incapacity cannot be inferred from a feeble condition of mind or body. Such a rule would be dangerous in the extreme. The law wisely sustains testamentary dispositions made by persons of impaired mental and bodily powers, provided the will is the free act of the testator, and he has sufficient intelligence to comprehend the condition of his property and the scope, meaning and effect of the provisions of his will."

That the test just indicated is the true one has been often asseverated by the judicial tribunals of England, as well as by those of our own State and of other portions of the country. Evidence respecting eccentricities of dress or demeanor, weakness of memory, absurdities of speech or conduct, and such like things, on the part of a decedent, is admissible in opposition to the probate of a paper offered as his will, only because it tends to show, in a greater or less degree, that, in the making and execution of such a paper, such decedent did not thoroughly understand what he was doing; was not able to appreciate the nature and extent of his possessions; could not, after calling to mind the persons who might naturally expect, because of the claim of kinship or for other reason, to participate in his bounty, form an intelligent purpose as to whom he would make, and whom he would refuse to make, his testamentary beneficiaries (Hathorn v. King, *8 Mass.*, *371;* Kinne v. Kinne, *9 Conn.*, *102;* Harwood v. Baker, *3 Moore P. C.*, *282;* Blanchard v. Nestle, *3 Den.*, *37;* Horne v. Horne, *9 Ired. Law*, *99;* Stevens v. Van Cleve, *4 Wash.*, *267;* Lowder v. Lowder, *58 Ind.*, *538;* Converse v. Converse, *21 Vt.*, *168;* Bleecker v. Lynch, *1 Bradf.*, *458;* Maverick v. Reynolds, *supra;* Crolius v. Stark, *supra;* Higgins v. Carlton, *28 Md.*, *115;* Matter of Forman, *54 Barb.*, *274;* Yoe v. McCord, *74 Ill.*, *33*).

The question, therefore, whether, in September, 1881, Miss Burr was competent to make a will is simply a question whether she was then capable of sufficient thought, reflection and judgment to know what property she had, and to decide and declare what should be done with it. It is, of course, impracticable to review

in detail the mass of evidence bearing upon this issue. Some of that which was introduced by the contestants is claimed by their counsel to establish the penuriousness of the decedent, her conspicuous untidiness, her want of delicacy in certain features of her daily life and a great and general impairment of all her mental faculties. They insist, indeed, that she was morbidly avaricious, nothing short of slovenly in respect to the care of her body and the fashion of her apparel, coarse and vulgar in her tastes, grossly offensive in certain of her personal habits, and well nigh bereft of her powers of memory. And they urge that these phenomena were so at variance with such as are ordinarily manifested in the case of persons endowed with reason and intelligence; so at variance, too, with such as the decedent herself displayed in her earlier years, as to render it probable that she had entered upon her second childhood, and was afflicted with that form of insanity styled "senile dementia."

The witness who furnished the most important testimony in support of this claim of the contestants was James McCabe, who, for four years before the death of Sarah Burr, was in her employ as a house servant, at 25 University place. No other witness, called upon either side of this controversy, saw Miss Burr so frequently during that period, or undertook to describe, with so much detail, the ordinary incidents and surroundings of her life. It would appear from his testimony, that she spent the greater part of her time in the kitchen, and it was in that room that she died, on the first of March, 1882. She was accustomed, early in the evening, to retire to bed in a room on the second

floor of her house, jointly occupied by herself and Mrs. McCabe. The parlor was only used on rare occasions, or when she received an old friend or acquaintance, or when some person called on an important business errand. At such times, Miss Burr would come up from the kitchen to see her visitor, having first with Mrs. McCabe's assistance, exchanged the dress that she commonly wore for another of more presentable appearance. Her appetite for food, if McCabe is to be fully credited, was extraordinary. She ate her meals alone, at a pine table covered with a coarse cloth. The plates and cups and saucers were nicked and cracked, and otherwise the worse for wear. The knife and fork and spoon were of a piece with the crockery. These articles of table furniture, as well as certain kitchen utensils, and some of the dresses alleged to have been worn by Miss Burr, were produced in court, and identified by the witness. He testified also to other matters, which seem to me to be of greater importance than any to which I have hitherto referred. Unless he swore falsely, or perverted or exaggerated the facts, the decedent frequently conducted herself, under circumstances which I need not here particularize, in such a way as to indicate gross indifference to her personal cleanliness and marked deterioration of her sense of shame.

This portion of McCabe's testimony is only secondary in importance to his assertion that Miss Burr forgot, almost immediately after its occurrence, the fact of the execution of the second codicil. It is worthy of remark that, as to neither of these two matters, is McCabe directly corroborated or directly contradicted, though it is apparent that, as to one of them, and

probably as to the other, his statements could have been supported if true, or denied if false, by at least one other person, who would have been a competent witness for either of the contending parties.  That person is McCabe's mother.  His brother John, also, was a not infrequent visitor to the basement floor of the house, and two of his cousins, according to his own testimony, were occasional callers, and saw and heard some of the sayings and doings which he alone has described. Counsel for the proponents claim that an inference may be justly drawn, against the truth of McCabe's story, from the failure of contestants to produce these other witnesses to vouch for it; opposing counsel contend, on the other hand, that the statements of James should be taken as accurate, because the proponent did not call to the stand the persons who, but for the truth of such statements, could have effectually disproved them.

I think that no inference can be drawn, for or against either party, from the non-production of the mother, brother and cousins of James McCabe.  Without the application, therefore, of any doctrine of presumption, I proceed to inquire what guaranty of the truth·of McCabe's unsupported statements touching these important questions is afforded by their inherent probability, or by their consistency with each other, and with facts otherwise proved, or by McCabe's intelligence in observing, and in reporting the results of his observations, or by his apparent freedom from bias and prejudice, or by his known character for honesty and truth.  Tried by these tests, he did not make, I think, a very creditable showing.  He is a man about thirty-one

years of age, of limited education and intelligence, as was made very obvious in the course of the trial. Just before entering into Miss Burr's service, he had been a peddler of vegetables, in partnership with an ex-convict named Mulligan. As to some of the incidents of his early life, and as to the circumstances under which he learned to read and write, he declined to testify, upon the ground that to do so truthfully would tend to degrade him. He avowed his disappointment that Miss Burr had died without making some provision by will or otherwise in his behalf. There was some difficulty in ascertaining the precise nature of his expectations in this respect. It was pretty clearly disclosed, however, in a portion of his testimony which I will quote: "Mr. Titus told Miss Burr that Mr. Riker said she should leave $10,000 to my mother, for her to get the interest of, and for me to get the principal, when she died, and Miss Sarah said that she had a paper made out for us."

From the appearance of this witness and from the character of his testimony, I am convinced that he was by no means free from bias against the decedent and her codicil, because of his failure to receive at her hands the recognition to which he felt himself entitled. Upon the whole, therefore, his statements should be received with great caution, especially such of them as relate to alleged occurrences, which though not positively denied by other witnesses, and not indeed susceptible of positive denial by any who were called in behalf of either party to this proceeding, are nevertheless unlikely to have happened in view of their antagonism to other facts and circumstances satisfactorily established

by the evidence. Of this nature are the two state-
ments which I have already characterized as the most
important in all McCabe's testimony. I am compelled
to doubt his account of what took place just before Miss
Burr entered her parlor to execute this codicil, because,
if that had happened which he described, Mr. De Grove
and Mr. Jockel could scarcely have failed to observe,
by sight or smell, the unpleasant indications of it. I
hesitate to accept his sweeping assertions of Miss Burr's
aversion to all cleanliness, because, if they were true,
they would almost certainly have received corrobora-
tion from other witnesses. And I cannot adopt the
conclusion that the decedent was substantially bereft
of her power of memory—a conclusion which the un-
qualified acceptance of McCabe's testimony would ren-
der necessary—because it is not, in my judgment, war-
ranted by the evidence of other observers more intelli-
gent than he, and freer from interest or bias.

The claim that Miss Burr was avaricious or miserly,
in the ordinary sense of those terms, is not, I think,
supported by the evidence. It does not appear that
she was specially eager to acquire wealth or specially
bent upon hoarding it. She was, so far as the evidence
reveals, close in her expenditures, sharp at a bargain,
and alive to the importance of getting her money's
worth for her money. She provided herself with few
of those surroundings which are commonly regarded as
the comforts of life, and had no part or lot in those
which are classed as luxuries. It may be unjust, how-
ever, to attribute to her parsimoniousness certain fea-
tures in the routine of the closing years of her life,
which at first blush might seem fairly ascribable to that

trait of character. Her indifference to dress, for example, which was proved by a multitude of witnesses, is easily explicable upon other grounds, and so also is her daily occupation of the kitchen, with its dilapidated furniture and meagre appointments. Toward the end of her days her annual disbursements are shown to have been at least $3,000. This, it is true, was but a petty fraction of her income, but a larger outlay might have involved a radical and, to her, perhaps, an unwelcome change in a course of life which long use had made habitual. She occupied premises which formed a part of her estate, and among the items of her expenses were included neither interest nor rent. With very rare exceptions, practically with none at all, supplies for the household were provided for nobody but herself and her woman servant, Mary McCabe. Had she been a niggard, out and out, she could surely have supported herself on a sum much less than $4,000 per annum.

I have already referred to the fact that she was well advanced in years before she had at her command a liberal income. It would have been strange, indeed, if she had then departed from the frugal practices of an already protracted life. I cannot but believe that, if in her declining years she had abandoned her career of economy, and had become lavish in her expenditures and luxurious in her tastes and habits, that circumstance would have been seized upon by the contestants as indicative of her mental incapacity. And to my mind it would have been a far stronger indication, than is now afforded by all the testimony which tells of her inordinate frugality and thrift.

Much of the evidence bearing upon the question of Miss Burr's mental capacity relates specially to the impairment of her memory, that faculty of the understanding which is wont to show the earliest and most conspicuous marks of decay.

Many witnesses, among whom were several called by the proponents, bore testimony to the fact that Miss Burr's memory grew less ready and less retentive with her advancing years, and that at the last, so far especially as concerned certain classes of subjects, it was defective in the extreme. She would repeat questions after they had once been answered, and repeat them anew when they had again received reply. It is very possible that, in some instances, these repetitions were due to her lack of attention, or what is commonly called absence of mind. For years before her death she had lived in great seclusion. The monotony of her life was seldom disturbed, and the decay of sensibility which is the natural concomitant of old age must greatly have diminished her interest in all that happened outside the walls of her own dwelling house. It is very likely, too, that behavior on her part which was attributed to loss of memory may sometimes have been due to defective hearing. The decedent was long very deaf, and her deafness toward the close of her life had notably increased. Such an infirmity always puts one who suffers from it at great disadvantage in the conduct of a conversation ; often at far greater disadvantage than is known to him, or would, if known, be readily acknowledged. And so it must often happen that, from remarks which he seems to hear and appre-

ciate, he either derives an erroneous impression or no impression at all.

The likelihood that phenomena which were really caused by deafness were sometimes erroneously attributed to loss of memory is very considerable, as regards the observation of certain of the witnesses who were themselves dull of hearing. They described interviews with Miss Burr wherein that lady, by frequent iterations of questions which had already been answered, seemed to them to betray her inability to keep the answers in her mind. But if Miss Burr were living to-day and were granted opportunity to give her own version of those same interviews she might in all ingenuousness ascribe her repetitions of questions solely to the fact that, when first asked they had been unheard or unheeded, and had therefore failed to elicit a reply. For a satisfactory reproduction of a dialogue between two deaf persons of even the most scrupulous veracity, it is obvious that utter reliance cannot be placed upon the report of either of the participants. Aside, however, from the instances in which the witnesses, who testified at this trial as to Miss Burr's forgetfulness, may have made inaccurate observations or drawn erroneous inferences, there is abundant evidence that, at the time she executed the so called second codicil, her memory had become seriously impaired. This impairment was observable both in respect to events long past and to those of recent occurrence. She would, in conversation with her friends, allude at times to the dead as if they were still living, although their deaths had been previously made known to her. She would frequently inquire as to the health, occupation, or whereabouts of a person,

and, on the heels of the answer, would repeat her question, and perhaps after a short interval, would repeat it yet again, though it had twice received reply. It is worthy of remark, however, that these lapses of memory seldom, if ever, related to business matters. Apart from the testimony of James McCabe, I recall no evidence which indicates any serious forgetfulness in that regard.

Mr. De Grove, who used to attend upon her at intervals to procure her signature to papers and documents, testifies that he often noticed her reiterations of questions, but never in connection with affairs of business. Mr. Riker, who shared with Mr. Titus the active management of her estate, says that he never observed any defects in her memory. Mr. Pelletier, who acted as the clerk of Mr. Titus, and who had occasion not infrequently to hold conferences with her, says that she would ask twice or three times after a person's health or whereabouts, but that these repetitions were "always with reference to some question of courtesy. When she asked me about any business matters, she never asked me over again to my knowledge." This calls to mind a saying of Cicero in the "De Senectute" (Edmond's translation) : "Nor indeed have I heard of any old man having forgotten in what place he had buried a treasure. They (the old) remember all things which they care about, appointments of bail, who are indebted to them, and to whom they are indebted."

It is not strange that the testimony as to Miss Burr's conduct, demeanor and appearance, is somewhat conflicting. It would be strange, indeed, if it were otherwise. The witnesses saw the decedent at different times

and under different circumstances.   Some of them were
the friends of her youth ; others never met her till
shortly before her death.   Their opportunities for ob-
servation were very unequal, and there was probably no
less inequality in the degrees of intelligence with which
those observations were made.   Besides, in the very
nature of things, not a little of the evidence relates, not
strictly to matters of fact, but to matters of opinion
and inference, respecting which each witness had a
particular standard of his own, a standard which es-
sentially differed, it may be, from that of anybody else.
Mrs. Cornwall, called by the contestant, thought that a
dress which Miss Burr wore on one occasion was "odd
and peculiar" and "unbecoming her station," partly
because it was soiled and dirty" and partly because it
was "dark brown with bright figures in it."   Miss
Catharine Kissam described what seems to have been
the same dress, as cleanly when she saw it, but as
"decidedly not according to the fashion."   Miss
McIntire, an old lady very neatly and trimly attired,
thought that Miss Burr was at times "excessively
slovenly in dress and appearance."   She recalled a
period, "forty or fifty years before," when decedent
was a "well bred, old fashioned lady, handsomely
dressed," and wearing kid gloves whenever she received
visitors.   Miss Phœbe Kissam thought the decedent's
black alpaca gown was "much worn," and that "her
shawl and headdress were not becoming at all."   In
the opinion of Mrs. Woolley, Miss Burr did not, in the
style of her apparel, "keep near enough to the fashion."
Mrs. William E. Dodge was of a different opinion.   So
were Mrs. Tallman and Mrs. Bloomfield, old friends of

the decedent.  Mrs. Thorne, Mrs. Skidmore and others, described her as always neat and clean, and ladylike in appearance.  Of course, no one will dispute that Miss Burr was at liberty to dress as she pleased, with deference to the prevailing mode or in defiance of it ; in garments rich and whole and clean, or poor and patched and dirty.  I have only reviewed this part of the testimony to show that there was nothing so grotesque or otherwise so singular in her appearance as to suggest mental impairment, and to illustrate, also, how widely the most honest and intelligent witnesses may differ in their inferences from the same facts.  The comments I have just made as to the testimony respecting dress are equally applicable to that which relates to the demeanor and conduct of the decedent, as described by the various witnesses.

I have already dwelt so long upon this branch of the present inquiry that I shall not further discuss in detail the testimony of any of the witnesses.  But some of Miss Burr's letters that are in evidence have so important a bearing upon the question of her mental capacity that they are deserving of special reference.  They are in a neat, precise, legible hand, which suffered little change from year to year.  The earliest from which I shall quote was written in 1865, when its writer was seventy-one years of age.  It is addressed to her friend Mrs. Wickham at Manchester, Vermont.  It acknowledges the receipt of that lady's photograph, and intimates an intention of sending her own in return.  It refers to the fact that the husband of her correspondent had solicited from her a contribution for Middlebury College, and dismisses that matter in these words :

"Those who reside in large cities often have such objects brought before them. Of course many of them we must decline."

The Mr. Wickham who thus vainly sought to befriend Middlebury College was a witness at this trial. He had then reached the age at which the decedent died. No person else gave testimony of greater interest or importance, or which has been more helpful to me in passing upon the issues of this case. In 1811, he was graduated at Yale College, in the class of James Burr. He knew Sarah for seventy years, during more than forty of which they were on terms of intimacy. He last saw her only two years before her death. He characterized her dress, demeanor and conduct as "always ladylike and proper," and her conversation as indicating "a high degree of intelligence and Christian feeling," which continued unabated until the last. Mr. Wickham corroborated the statements in her letters as to his endeavor to excite her interest in Middlebury College. It seems that he had added argument to solicitation, but all in vain. In view of their mutual relations of respect and confidence, this fact has much significance.

Another letter to Mrs. Wickham, written a year later, when Miss Burr was seventy-two years old, is also of interest in many aspects of this case. After alluding to the death of her sister Mary, which was then recent, she says : "I doubt not, my dear friend, that you have often thought of me in my loneliness. My house is left unto me desolate. . . . I have friends who are very kind, yet memory must bring to the last survivor of a family many associations that find no responsive heart to exchange the dear intercourse of kindred. In

the death of my dear sister I have much to comfort me. Indeed, I mourn only for myself. To her the future was bright and happy. Her only sorrow was leaving me. She had often said, previous to her last illness, that I was the only tie to keep her here."

By a letter written to Mr. Allen in June, 1870, when she was seventy-six years of age, she gave minute directions for the funeral of a Miss Sarah Woolley, an old lady who had been the object of her careful attention for many years. In the following August, she again wrote Mr. Allen, making considerate suggestions as to the disposition of certain articles of Miss Woolley's estate.

In October, 1874, when she was eighty years of age, she wrote to her friend, Mrs. Bloomfield, a letter of condolence upon the death of her son. In January, 1879, while James McCabe was an inmate of her house, she again wrote Mrs. Bloomfield, whose husband had just died. Miss Burr was then eighty-five years of age. "My dear afflicted friend," she writes, "a slight indisposition which confines me to the house will prevent my seeing you in this your severe bereavement. The sympathy of friends is comforting, but I trust you have a higher source of consolation than human sympathy. I hope to be able to come and see you in a few days."

On the 11th of May, 1880, at the age of eighty-six, she wrote to Mr. Pelletier the following letter: "I will thank you to acquaint me what has been done in regard to the mortgage on Sixty-first street."

James McCabe would have it believed that, when Sarah Burr sat down to write, he told her what to say. By comparing the diction of her letters with that of his

testimony, I have been confirmed in my conviction that the latter is not altogether to be trusted. Much more of it than I am disposed to credit could be reconciled, however, with the mental competency of Sarah Burr. If it be possible that her forgetfulness and inattention were ever as pronounced as he described them to be, it, by no means follows that she could not have roused herself for the transaction of important business which had long been the subject of her thoughts; and far removed, indeed, must she have been from a condition of imbecility, if, after deporting herself in the kitchen as he says she was wont to do, she could straightway proceed to the parlor, and there display the manners and intelligence of a cultivated lady.

In considering the question of Miss Burr's competency, I have derived no assistance from the distinguished alienists who were examined in behalf of the contestants. I do not doubt the accuracy of their definitions of senile dementia, or of their description of the symptoms which ordinarily attend it. But they never saw Sarah Burr, and they only pronounced her demented upon the assumption of the truth of certain hypotheses touching her character and conduct, which, in my judgment, were not proved to be well founded. I must reject the conclusions of these expert witnesses because I reject the premises upon which they are based.

A careful consideration of all the testimony has not left my mind in doubt of Sarah Burr's testamentary capacity at the time of the execution of the second codicil.

It is further urged by the contestants that, even if the

evidence does not establish that, when this disputed paper came into being, Sarah Burr was incompetent to make a will, she was nevertheless so broken in mind and body that she could not effectually protect herself against importunity and fraud; that such paper is not really the product of her own thought, reflection and judgment, but that some person or persons unknown, by means of influence and control such as the law condemns, induced her to accept it and sign it and publish it as a second codicil to her will. What that influence is which is deemed sufficient to invalidate the testamentary act of one upon whom it is practised, has been frequently expounded by our Court of last resort (Seguine v. Seguine, *3 Keyes, 663;* Gardiner v. Gardiner, *34 N. Y., 155;* Clapp v. Fullerton, *34 N. Y., 190;* Brick v. Brick, *66 N. Y., 144;* Cudney v. Cudney, *68 N. Y., 148;* Children's Aid Society v. Loveridge, *70 N. Y., 394;* Horn v. Pullman, *72 N. Y., 269;* Coit v. Patchen, *77 N. Y., 533;* Marx v. McGlynn, *88 N. Y., 357*).

Of these cases just cited, that of the Children's Aid Society v. Loveridge, has many features in common with the case at bar. It was there claimed, by the contestants, that the will in controversy was procured by the influence of the very persons who directly benefited by its provisions. In referring to this fact, the court says: " Gratitude, love, esteem or friendship, which induces another to make testamentary dispositions of property, cannot ordinarily be considered as arising from undue influence . . . In order to avoid a will upon any such ground, it must be shown that the influence exercised amounted to a moral coercion which

restrained independent action and destroyed free agency, or which by importunity that could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist." Says the Court of Appeals, in the recent case of Marx v. McGlynn (*supra*): "It is not sufficient, for the purpose of establishing undue influence, that the will is the result of affection or gratitude, or the persuasion which a friend or relative may legitimately use; but the influence must be such as to overpower and subject the will of the testator, thus producing a disposition of property which he would not have made if left freely to act his own pleasure."

Now, what are the facts to which these doctrines of the law must be here applied? Though the written objections to probate do not specify by name the person or persons by whom the mind of the decedent is claimed to have been controlled, it is manifest, from the whole course of the trial, that the contestants mainly rely upon those parts of the evidence which connect Mr. James H. Titus with the preparation and execution of the second codicil. Mr. Titus, who died before this trial began, at the age of more than eighty years, was intimately acquainted with the Burr family for more than half a century. He was one of the appraisers of the estate of Sarah's father, who died in 1829. For years before Margaret's death, he had much to do in the management of the estate, and his shrewdness and sagacity seemed to have contributed not a little to the final success of the long struggle of the Burr sisters to maintain possession of their "pasture lot," until the time was ripe for parting with it. Upon the decease of Margaret,

of whose will he was an executor, he entered upon a still wider and more active superintendence of the business affairs of her surviving sisters, and after Mary died he was continued in his stewardship until the decedent herself had ceased to live. By Mary's will he was named as one of its executors, and Sarah in her turn followed in this regard the example of her sisters. During all the years that Mr. Titus was engaged in the administration of these trusts, he was on terms of great social intimacy at first with the whole Burr family, and at the last with its sole remaining representative. In the house where she lived and died were found many letters in his handwriting, some of which, addressed to herself, are of later date than the first codicil, and urge the importance of supplementing the provisions of that instrument by executing another.

I shall refer to these letters in the order of their dates, quoting from them such passages as are pertinent to the present inquiry. The earliest purports to have been written on January 10th, 1874: "Have you yet come to any conclusion," writes Mr. Titus, "in relation to the matter of which I have frequently spoken—and handed to you what I thought might meet your views—briefly written out for your consideration? If the views I presented do not meet your approbation—as you know the importance of the matter—I hope you will determine on some action which you will be satisfied to put into execution. You will excuse my importunities as now and heretofore shown."

On February 3rd, 1875, writing from his office in New York, he calls Miss Burr's attention to two newspaper clippings contained in his letter, and asks her to

keep them until he calls.   The inclosure comments on the charitable legacies of John M. Sharpless.   Mr. Titus adds, in a postscript: "Such legacies as that of Mr. Sharpless give honor to the testator's memory, and are examples for citizens of great wealth."

On March 22nd, 1875, he writes from his office that, on the next day, he will call to "ascertain when you will be ready to consider that important business concerning which you have expressed a desire to have my views."

In a letter from Malone, N. Y., dated April 25th, 1875, he says: "I expect to be home by Friday, and hope to find you in health and ready to take up for action that very important matter on which you have so long deliberated.   You must excuse me for referring to this subject so frequently.   It is the serious importance of the matter which prompts me."

A letter bearing date March 21st, 1876, which was apparently taken by the writer himself to Miss Burr's residence, invites her "particular attention" to a report concerning the "Woman's Hospital," which he had left at the door.

The last letter of the series was written from Malone, April 26th, 1876, more than five years before the execution of the last codicil.   The writer, referring to the fact that, some days before, he had called at Miss Burr's to get her signature to a paper, explains why he failed to accomplish his purpose.   "The fact was," he says, "that getting engaged in conversation with you, relative to that important matter concerning your will, which I have urged on your attention for a long time, the special matter of my call got out of my mind.   I

hope when I get home you will have matured in your mind some line of action in that matter, and be ready to make such codicil to your will as shall be in your judgment best calculated to dispose of the large residuary estate, which will occur (unless you make by codicil provision for its disposal) when your executors shall be called on to administer on your estate. It is, in the opinion of Messrs. Riker and myself, a matter of great importance. . . . Delay in such matters is dangerous, as proved to be the case with my father in his procrastination in the making of a will, by which great injury resulted in the settlement of his estate and serious loss to his family. . . . My excuse for thus writing on this subject is your frequent application to me for my opinion."

There is other evidence, confirmatory of the fact which is demonstrated by these letters, that it was the opinion of Mr. Titus that a portion, at least, of the income which had been rapidly accumulating since the first codicil, and was accumulating with growing rapidity every day, should be diverted from the few legatees upon whom, by her will, Miss Burr had bestowed her entire residuary estate. This wish he expressed on several occasions to Mr. Riker, and he apprised Mr. Pelletier of his unsuccessful efforts to persuade the decedent to discharge at once the bequests contained in the wills of Margaret and of Mary, and thus to check to some extent the further enlargement of her own estate.

I do not find, however, that Mr. Titus concerned himself in the least with shaping the particular provisions of the second codicil. Mr. Riker testified that it was

he himself who prepared the list of beneficiaries which appears in that instrument, and that he received from Mr. Titus no suggestion whatever; that between that gentleman and himself there was never any discussion or conversation, as to what societies were worthy to be included in the scheme of Miss Burr's charities, and that, so far as he knows, Mr. Titus was ignorant of the contents of the second codicil until the very hour of its execution. With the exceptions to which I shall presently refer, the case is barren of evidence that Mr. Titus pressed upon the decedent's attention the claims of any special person or institution upon her testamentary bounty. While he was anxious that she should somehow revise her will, he seems to have betrayed little solicitude as to the details of the revision, and when he descended from generals to particulars, his suggestions were apparently disregarded. For example, he is shown to have had some special interest in the prosperity of the Women's Hospital, which is named as a legatee by the first codicil. His letter of March, 1876, above quoted, invites Miss Burr's particular attention to a certain report of that institution which he left at her door. If this action is to be interpreted as a manœuvre on his part to secure another legacy for that hospital, it was utterly unsuccessful. For though the decedent told Mr. Titus that she especially wished to befriend, by her second codicil, women and children and the needy and the sick, the Women's Hospital finds no place in its list of beneficiaries.

Again, it appears from the testimony of James McCabe that, in none of the interviews between Miss Burr and Mr. Titus, did he ever hear that gentleman mention

any of the societies named as decedent's legatees. These are McCabe's words : " All I have heard Mr. Titus say, was that Miss Sarah ought to build a hos- pital and call it ' The Three Sisters,' and she said ; ' No.' " And yet again ; in the first of the above quoted letters of Mr. Titus (that of January 10th, 1874), he re- fers to the fact that he had handed to Miss Burr, for her consideration, a brief paper embodying what he thought might meet her views. This paper is probably the one introduced by the contestants on December 18th, 1882. It is in the handwriting of Mr. Titus, and is the only document produced on either side which an- swers the description of the one referred to in the 1874 letter. It is in the form of an unexecuted codicil and contains two clauses. The first gives a small annuity to a house servant ; the second revokes the residuary clause of the will, and directs a *pro rata* distribution of the whole residue among those societies which are given specified pecuniary legacies in that instrument. This, the most important of the particular suggestions shown to have been made by Mr. Titus, met the same fate which befell the rest, and strongly tends to refute the claim that she was infirm of purpose, and easily swayed by the counsels of those who had won her con- fidence and regard.

It is not surprising, in view of the relations of Mr. Titus to the Burr family and to the Burr property, that the decedent should have consulted him in regard to the distribution of the fortune which she owed, in part at least, to his efficient services in her behalf. Nor is it strange, under all the circumstances, that he some- times proffered advice on occasions when it was un-

sought, and made use, indeed, of the "importunities" for which in one of his letters he offers mild apology. But I have ransacked the evidence in vain to find that any provision of the second codicil was inserted by his procurement, or that he had a sinister purpose in aught that he said or did, to bring that instrument into existence. It is possible, as the contestants claim, that his zeal and assiduity may have been prompted to some extent by a wish to associate himself prominently with the liberal schemes of charity which are projected by this series of testamentary papers. But if such were his motive it was not altogether unworthy, and calls for no censure, even if it fails to merit commendation.

It transpired, in the course of this trial, that, although at his death Mr. Titus left a will, disposing of a very considerable estate, he made no bequests therein for purposes of charity. An inference unfavorable to his character for sincerity is sought to be drawn from this circumstance. I think that such inference is unwarrantable. Even if it did not appear, as it does appear, that Mr. Titus gave practical demonstration in his lifetime of his interest in charitable objects, the severest criticism which could fairly be passed upon him would be this : that he was more liberal with his advice than he was with his money. If such were the fact, he was by no means singular in his life-time, and at his death he left large numbers of like persons him surviving. In justice to his memory, I feel bound to say that, though I permitted a wide and searching inquiry into his dealings with this estate, that inquiry resulted in disclosing absolutely nothing to his discredit.

The only person, except Mr. Titus, whose action in

connection with the making of this codicil can possibly
be regarded as the exercise of undue influence is Mr.
John H. Riker. The part which he took in the matter
has been fully stated already. That, at Miss Burr's re-
quest, he suggested the names of certain charitable
institutions as worthy to be aided by her bounty, and
that she adopted those suggestions in the full faith that
they were unselfish, judicious and calculated to sub-
serve the purpose that she sought to accomplish, I have
no doubt. In all this, however, I find no grounds for
animadversion upon either the decedent herself or the
friend whom she had chosen for her adviser. If it was
her general purpose to devote her posthumous estate
to purposes of charity, I am at a loss to conceive what
course was open to her at her time of life, which could
have seemed wiser in anticipation, or would have
proved wiser in its results than the very course which
she adopted.

Before the making of the second codicil Sarah Burr,
as appears from the testimony of many witnesses, had
two clear and definite purposes respecting the division
of her estate : the one that she would give little to
relatives ; the other, that she would give much to
charity. The latter purpose was formed many years be-
fore her death, even before the execution of either of the
codicils or of the will itself. Those instruments may not
inaptly be characterized as *quasi* codicils to the will and
the codicil of her sister Mary, themselves almost in the
nature of codicils to the will of Margaret. In other words,
each of these six testamentary papers forms part of a con-
nected scheme for the disposition of the Burr estate.
The evidence, indeed, affords ground for believing that

the inception of this scheme may have preceded by many years the preparation of the earliest written instrument which gave it practical expression.

Joseph Burr, a bachelor uncle of decedent, who lived and died at Manchester, Vermont, by his will, which he executed about the time of his brother Isaac's death, gave directions for the distribution of what must have been, at that time and in that part of the country, a very large estate.   He gave to certain individuals sums which amounted, in the aggregate, to an inconsiderable part of his fortune.   The largest legacy fell to Sarah's brother James, who was bequeathed $5,000.   Sarah herself and six other persons were made residuary legatees; but, apart from this recognition, the testator's only gift to his nieces was "the sum of $100 for the purchase of jewelry or other memorials of friendship." He gave, however, to various charitable, religious and educational institutions sums amounting in all to nearly one hundred thousand dollars.

After the death of Sarah Burr, there was found among her papers, at her house in University place, a copy of her uncle Joseph's will.   It is by no means unlikely, as suggested by counsel for the proponent, that it served as in some sort a guide for the testamentary dispositions which were made many years after, in the first instance by decedent's sister Margaret, and at later periods by Mary and herself.

In nearly all the reported cases where an instrument purporting to be the will of a decedent has been successfully impugned on the ground of undue influence, it will appear, upon careful scrutiny, that the evidence

has demonstrated one or more of the following propositions:

(*a.*) That the provisions of the rejected paper were inconsistent with the decedent's intentions as previously expressed.

(*b.*) That those provisions were unnatural or unfair in ignoring such claims of kindred as ordinarily receive testamentary recognition.

(*c.*) That from those provisions the person shown to have exercised the undue influence derived, directly or indirectly, some benefit or advantage.

In the present case, no one of these propositions has been established. The paper propounded as the second codicil is in thorough harmony with the spirit of the first codicil and of the will itself. It accords, so far as we are advised by the evidence, with every intimation that Miss Burr, by tongue or pen, ever gave concerning her testamentary purposes. When it was executed, there was nothing in her relations to any of her kins-folk calculated to swerve her in the least from giving a new sanction to those schemes in behalf of charity, education and religion, to which she had already devoted the bulk of her fortune. She was bound to no living human being by the ties of close consanguinity. She had no father, mother, husband, child, brother, sister, uncle or aunt. Nor was there any descendant of brother or sister, or any child of uncle or aunt. Her nearest relatives were the great grandchildren of her grandparents, and between them and herself there does not appear to have been any special intimacy or affection.

I am inclined to think that few people are strongly

attached to their second cousins as such, or are disposed to recognize a relationship so distant as constituting, of itself, a claim upon testamentary bounty. The Statute of Distributions is, no doubt, a fair exponent of the general sentiment upon this subject. To divide an intestate's estate among his next of kin according to that plan of distribution which seems most accordant with the dictates of natural affection is the object which that statute specially seeks to accomplish. Now, one of its most prominent features is its recognition, within specified limits, of the doctrine of division *per stirpes* whenever the intestate's next of kin are of unequal degrees of consanguinity. Where one, who would have been entitled, if living, to receive a certain share, is not alive to take it, his children are allowed to enjoy it in his stead. But this privilege is not without its definite and somewhat narrow limitations. "No representation," says the statute, "shall be admitted among collaterals after brothers' and sisters' children" (2 R. S., 96, ch. 6, tit. 3, § 75 ; *3 Banks, 7th. ed., 2304 ;* Adee v. Campbell, *79 N. Y., 52*).

The right of representation, even to the remotest generation, is accorded to all those in whose veins flows the blood of the intestate, but is denied to his collateral relatives who are not as near of kin to him as his nephews or nieces.

If, therefore, Sarah Burr had died intestate, and there were now surviving a single individual among the grandchildren of any of her grandparents, this estate would go *in toto* to such individual, to the utter exclusion of all who appear as contestants in this proceeding.

When it is considered how slight, in the estimation of the law, is the hold which one has upon the testamentary bounty of his remote collateral kindred, it is evident that these contestants find little basis for attacking the validity of the disputed codicil in the mere circumstance of their consanguinity to the decedent. That a competent testator must be accorded the right to dispose of his estate, if he chooses to do so, in defiance even of the natural and reasonable claims of his own children, has been repeatedly asserted and is clearly recognized in the case of Horn v. Pullman, above cited. *A fortiori*, must he be allowed the liberty of cutting off his more distant relatives whenever it jumps with his humor so to do.

I conclude, therefore, that there is nothing unnatural or unjust in the terms of the instrument here in dispute ; that it expresses the free, unrestrained, deliberate purposes of the decedent ; that she was of sound mind and memory when she signed and published it ; and that it is entitled to be admitted to probate as constituting, with the will and the first codicil, the last will and testament of Sarah Burr.